IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:20CR00063 MTS |
| | ) |
| NICHOLAS J. PROFFITT, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

Nicholas J. Proffitt, age 45, requests the Court follow the joint sentencing recommendation of the parties and sentence Mr. Proffitt to the maximum sentence within the applicable guideline range which is 191 months - 10 years on Count I consecutive to 71 months on Count II. The government is not requesting an upward departure, and the Presentence Investigation Report completed by the U.S. Probation Office, as requested by the Court, does not identify any factors that would warrant an upward departure from the applicable sentencing range. Mr. Proffitt's offense conduct does not involve aggravating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines applicable to his offense to advance the objectives set forth in 18 U.S.C. §3553(a)(2). The following is stated in support of the jointly recommended sentence:

**The history, characteristics, and offense conduct of Nicholas Proffitt:**

**Delusional Disorder Persecutory Type and Schizophrenia**

Mr. Proffitt suffers from delusional disorder persecutory type and schizophrenia. PSR ¶67 & ¶68. According to the National Library of Medicine, a delusion is a fixed false belief based the inaccurate interpretation of an external reality despite evidence to the contrary. The diagnosis of delusional disorder is made when a person has one or more non-bizarre, delusional

thoughts (situations that are not real but also not impossible) for one month or more that cannot be explained by any other condition. There are several types of delusional disorder including persecutory type. The central theme of persecutory type is being conspired against, attacked, harassed, and obstructed in the pursuit of long-term goals. People with persecutory type delusional disorder can be anxious, irritable, aggressive, or even assaultive. [Delusional Disorder - StatPearls - NCBI Bookshelf (nih.gov)](#).

Mr. Proffitt also suffers from schizophrenia which is a serious mental illness that affects how a person thinks, feels, and behaves. People with schizophrenia may seem like they have lost touch with reality. Psychotic symptoms include changes in the way a person thinks, acts, and experiences the world. Psychotic symptoms of schizophrenia include hallucinations like hearing voices. Delusions are another symptom. For example, individuals experiencing delusions may believe that people on the radio and television are sending special messages that require a certain response, or they may believe they are in danger or that others are trying to hurt them. *See* [NIMH » Schizophrenia (nih.gov)](#).

**Mentally incompetent to proceed**

In the early stages of the federal prosecution against him, Mr. Proffitt was found to be incompetent to proceed. His mental disorders significantly impaired his ability to understand the nature and consequences of the court proceedings against him and his ability to properly assist counsel in his defense. *See* Forensic Evaluation (hereinafter "F.E.") Doc. #45 p. 16-17 & PSR ¶67. He was found to be suffering from one or more persistent delusions that were not attributable to the physiological effects of a substance or another medical condition and were not better explained by another mental disorder. Mr. Proffitt's persecutory beliefs centered on his perceived belief that his coworkers, employees at vehicle repair shops, Arab-Americans, and law enforcement had been conspiring to tamper with his cars, give him unknown illnesses, and carry

out terrorist attacks. *See* F.E. Doc. #45 p. 12. The forensic examiner determined from records that Mr. Proffitt had been suffering from a mental disorder for years and had been in a residential treatment setting for mental health as an adolescent. He'd also been previously admitted to a mental health hospital after the terrorist attack in New York on 9/11 when he thought people were following him. *See* F.E. Doc. #45 p. 5.

During his forensic examination, Mr. Proffitt reported the crux of why he committed his federal offense conduct. While in jail prior to the 9/11 terrorist attack in 2001, Mr. Proffitt believed he provided a fellow inmate from Afghanistan the idea to fly a plane into the World Trade Center. When the terrorist attack on 9/11 occurred, Mr. Proffitt contacted the FBI to inform them of his conversations with the inmate. As a result, Mr. Proffitt believed the FBI began following him. Mr. Proffitt also believed he was thereafter mistreated because of what he'd done related to 9/11. He heard "whispers" and knew people "wanted to kill him." *See* F.E. Doc #45 p. 8. While explaining his connection to 9/11 to the forensic examiner during the competency evaluation, Mr. Proffitt made connections between his beliefs and seemingly innocuous events. For example, he reported a pizza delivery driver calling him "brother" as evidence of being followed and targeted. Some of his explanations were described as difficult to follow by the forensic examiner. Mr. Proffitt was noted to present with response latency at times which the forensic examiner noted as a possible sign that Mr. Proffitt was experiencing hallucinations while speaking with the forensic examiner. *See* F.E. Doc. #45 p. 10.

**Criminal conduct based on delusions**

When Mr. Proffitt vandalized the Islamic House of Wisdom in Michigan in 2005 by throwing rocks at the building (PSR ¶54), he thought people "were following him and talking about him." He believed cars parked near the House of Wisdom belonged to Saddam Hussein. *See* F.E. Doc. #45 p. 9. He was sentenced to probation with mental health treatment and completed

3

probation successfully with the help of mental health professionals. PSR ¶54. When he threw rocks at the Islamic Center in Cape Girardeau, Missouri, causing property damage in 2009, he again believed cars parked near the Islamic Center belonged to Saddam Hussein. *See* F.E. Doc. #45 p. 9. He also believed terrorists were involved with the Islamic Center because the windows to the building were tinted and a box truck parked outside of the building never moved. *See* F.E. Doc. #45 p. 7. His blood alcohol level during the offense in 2009 was .133%. PSR ¶57. He was sentenced to three years in prison for the offense. PSR ¶57. He was not taking any mental health medications or under the care of mental health professionals when he damaged the Islamic Center in Cape Girardeau in 2009.

**Mr. Proffitt's mental health improves with mandated treatment**

Mr. Proffitt had no known violations while in prison for the vandalism of the Islamic Center in 2009. PSR ¶57. When released to parole, he completed his parole with no violations and participated in mental health treatment. PSR ¶57. Mr. Proffitt never failed to maintain his mental health treatment appointments, and he spoke freely with his therapist. He was noted as being "fairly compliant" in taking his antipsychotic medications. During an appointment in January of 2011, the therapist noted, "Mr. Proffitt reported a belief that several people he saw on the news who were arrested might be 'connected to Osama Bin Laden making holes and planting bombs in the New Madrid fault to start an earthquake.'" *See* F.E. Doc. #45 p. 9. The therapist noted Mr. Proffitt had no overt psychotic symptoms, however, other than the referential thoughts about Osama Bin Laden and an impending earthquake as a form of a terrorist attack.

After Mr. Proffitt completed parole, he had no mandatory oversight. He maintained some contact with his mental health therapist voluntarily, however, but was discharged unsatisfactorily in 2015 because he did not keep scheduled appointments. *See* F.E. Doc. #45 p. 9. Mr. Proffitt had no further encounters with law enforcement after his release from prison in 2010 until he

4

committed the federal offense conduct 10 years later, on April 24, 2020. He maintained consistent, fulltime employment during those 10 years and lived a productive life without incident. However, he continued to struggle with delusions.

**10 years of delusions preceding Mr. Proffitt's federal offense conduct**

Immediately upon his release from prison in 2010, Mr. Proffitt obtained fulltime employment at a factory that made airbags for vehicles. He did well at the company for six years until he determined there were people there that didn't like him. He believed several of his coworkers belonged to a "biker gang" and were "messing with his cars." *See* F.E. Doc. #45 p. 4. Mr. Proffitt believed his coworkers were sabotaging his automobiles by manipulating bolts, and he incurred significant expenses at repair shops paying mechanics to search for defects. Mechanics expended an inordinate amount of time performing diagnostic work to remedy the mechanical issues Mr. Proffitt believed were present, but none were ever found. It was all a delusion. Mr. Proffitt was not satisfied with the results, traded several cars for different cars, and ultimately allowed his final car, a brand-new vehicle, to be repossessed. He was convinced it had been sabotaged. Thereafter, he chose to ride a shuttle bus to work, and his family was greatly inconvenienced because of the lack of a family vehicle. The repossession of his car also unnecessarily ruined the credit he'd worked hard to achieve.

In 2016, Mr. Proffitt became sick and believed he was dying because someone at work had accessed a biological agent to make him sick. He believed his coworker, a former military person, poisoned Mr. Proffitt on purpose. *See* F.E. Doc. #45 p. 4. It was a delusion. Mr. Proffitt left his employment over that belief combined with the delusion his coworkers were tampering with his cars. *See* F.E. Doc. #45 p. 4. He proceeded to immediately secure fulltime work at another factory, but the delusions persisted until the day of his arrest at that factory for his federal offense conduct.

5

**The federal offense conduct**

According to F.B.I documents, several individuals were interviewed about Mr. Proffitt after his arrest for the arson of the Islamic Center. In one report, it was noted that Mr. Proffitt's fiancé informed law enforcement he'd been diagnosed with a mental health disorder, and she reported finding medication associated with schizophrenia in their home. Another family member spoke with law enforcement and advised Mr. Proffitt believed 9/11 was his fault because he told individuals a good way to take down a tall building would be to use an airplane. The person explained Mr. Proffitt had made paranoid statements about Muslims, and he held the belief that a box truck he saw was full of Islamic people who were going to come to his job, poison the food, and try to kill everyone. An individual who had lived with Mr. Proffitt years prior in Michigan also participated in an interview with the F.B.I. The man advised Mr. Proffitt was "schizophrenic, bipolar, and living out of a dumpster" when the man asked Mr. Proffitt to live with him to provide Mr. Proffitt stability. The F.B.I. interviewed another one of Mr. Proffitt's friends, and the man indicated the last few times he spoke to Mr. Proffitt before the arson Mr. Proffitt "seemed very paranoid" and advised "someone was messing with his house and car." The man advised Mr. Proffitt thought he was being followed.

Mr. Proffitt's house, personal property, and social media were thoroughly searched by the F.B.I. as part of the investigation into the arson. The agents searched for evidence of racial animus against Muslim or Arab people. None was found. There were no social media postings. No journals. No history of accessing internet sites related to racial animus. Mr. Proffitt belonged to no hate groups. There was nothing to evidence his participation in a social-developmental model of radicalization. There was no evidence he harbored any type of animus outside of his response to the delusions inside his head. Nevertheless, the delusions triggered animus and a devastating criminal act.

**Mr. Proffitt is restored to mental competency after months of psychoeducational instruction and antipsychotic medication at the Federal Bureau of Prisons**

This Court ordered Mr. Proffitt to be transported to the Federal Bureau of Prisons on August 16, 2021, for mental health treatment and competency restoration. When he first arrived at the medical center for competency restoration, he reported hearing voices "whispering." *See* Forensic Psychological Report (hereinafter "F.P.R.") Doc. #53 p. 10. He expressed delusional-sounding beliefs. Specifically, he stated he believed the "F.B.I. is following [him] because [he] was involved in 9/11." He was somewhat guarded when asked about psychotic symptoms and paranoia. He said he often suspected people were talking about him. When asked who would be talking about him, he said, "People all over … in the grocery store … inside my house." *See* F.P.R. Doc. #53 p. 10. Throughout the initial contact with Mr. Proffitt, the forensic staff observed Mr. Proffitt to stare blankly and gaze downward. The chief of forensic psychiatry for the federal medical center described Mr. Proffitt to present as disorganized, delusional, and with auditory hallucinations. *See* F.P.R. Doc. #53 p. 10.

**Mr. Proffitt is medication compliant**

At first, Mr. Proffitt indicated he would not take psychiatric medication. However, a week after his initial meeting with the forensic staff, he acknowledged being diagnosed with paranoid schizophrenia after 9/11. He asked the forensic staff for details about the diagnosis, and the chief of psychiatry reviewed medication options with Mr. Proffitt. Mr. Proffitt was offered a trial of Invega[1] which is an antipsychotic. The generic form of the drug is paliperidone. Mr. Proffitt

---

[1] Invega is the brand name for paliperidone. Paliperidone is a medication that works in the brain to treat schizophrenia. Is it an antipsychotic. It rebalances dopamine and serotonin levels in the brain to improve thinking, mood, and behavior. It takes several weeks to see big enough changes in symptoms to decide if paliperidone is the correct medication for a person with a mental health disorder. *See* www.nami.org/About-Mental-Illness/Treatments/Mental-Health-

questioned why he needed to take medication given his reported negative experiences with psychiatric medications in the past. Mr. Proffitt opined agreeing to take Invega as an oral pill was "basically like jumping in a used car" because Invega was a new, second- generation antipsychotic with which Mr. Proffitt wasn't familiar. He ultimately indicated he would "think about it", and a week later he agreed to a trial of Invega when he met with the chief of psychiatry. Mr. Proffitt was initiated on 3 mg of Invega by oral pill beginning the following day. *See* F.P.R. Doc. #53 p. 10-11.

**Antipsychotic medication begins to balance the neurotransmitters in Mr. Proffitt's brain**

Mr. Proffitt's symptoms slowly improved as the antipsychotic medication began balancing the dopamine and serotonin levels in his brain. After a week of taking the medication, he stated he intended to continue taking it and was interested in transitioning to a less restrictive housing unit. He continued to indicate he was "stressed" as a result of what "they were doing to" him, including tampering with his vehicles and loosening bolts. He asserted it was motorcycle gangs who perpetrated these acts against him and stated, "that's not delusional." As a result, his dose of Invega was increased to 6 mg. A week later it was increased to 9 mg when Mr. Proffitt verbalized several beliefs reflective of paranoid delusional ideation during a competency group restoration meeting. *See* F.P.R. Doc. #53 p. 11.

As the weeks progressed, Mr. Proffitt's antipsychotic medication was again increased to 12 mg when he denied any changes in his symptoms aside from feeling sleepy. He initially declined the offer to transition to a long-acting injectable form of the medication in lieu of a daily

---

Medications/Types-of-Medication/Paliperidone-(Invega). Antipsychotic treatment is generally needed lifelong for persons with schizophrenia.

oral pill. However, he soon agreed to change to the injectable and received a 234 mg injection of the antipsychotic. He agreed to change to the injectable as he was not experiencing any of the bad side effects he experienced with previous antipsychotic medications. A week later he willingly received another injection and presented with less disorganized thoughts. He denied concern regarding others having malicious intentions toward him. As the weeks progressed, he continued to be medication compliant and was able to articulate he knew he was at the federal medical center for competency restoration and was able to describe the charges against him accurately. *See* F.P.R. Doc. #53 p. 12.

**Delusional thinking wanes**

By the end of his stay at the federal medical center, Mr. Proffitt was able to speak more rationally about his situation when he met with the forensic psychologist at length. Mr. Proffitt stated he no longer believed people were following him. He said he did "not necessarily" believe now that 9/11 was his fault. He equivocated regarding whether he believed Islamic people were sometimes against him and stated, "I wouldn't be here today if they didn't have a box truck parked at their mosque… The box truck never left my mind. I don't understand a lot of this myself, either … It just tears me apart because I think I'm just starting my life… I've never seen anything like [the box truck scenario] before … I couldn't escape the thought of that being terrorism related." He added, "I don't know why all this bothered me so much. 9/11 scared me, and there was nothing I could do about it." When specifically asked about whether he believed the F.B.I. was following him, he indicated he did not know and added, "I don't think about it too much." When asked if he believed he would be followed again if released to the community, he stated, "I don't know… I feel like I've caused a lot of trouble in this world. I would have to start all over." *See* F.P.R. Doc #53 p. 13.

**Mr. Proffitt is restored to mental competency**

By July of 2022, Mr. Proffitt had improved in that he could acknowledge his mental health disorder and appreciate the benefit of his antipsychotic injections. He acknowledged being diagnosed with schizophrenia and said he thought proper antipsychotic medication was good medicine for the condition. He said he previously thought people were laughing at him and pointing him out. With continued medication, he stated, "Now in a large crowd, I don't feel like people are paying attention to me as much." He became tearful while reflecting on his actions regarding the Islamic Center and how much his previous psychotic symptoms negatively affected his life. After four months of Mr. Proffitt's voluntary compliance with antipsychotic medication treatment, he was cooperative, engaged in the interview, and answered questions relatively coherently. His affect was overall calm and stable. His demeanor was respectful and polite. He did not appear to be hallucinating and denied when asked. No psychomotor agitation or retardation was noted. *See* F.P.R. Doc. #53 p. 12 for a complete summary of the evaluation on July 5, 2022.

By the end of his competency restoration at the federal medical center, Mr. Proffitt had adjusted to the correct amount of antipsychotic injection and was residing in the open portion of the mental health unit. He was noted to not be a behavioral management problem and appeared to get a long well with staff and peers. He attended adequately to his hygiene and activities of daily living. He was a reliable attendee at competency restoration group sessions and did not exhibit overt symptoms of psychosis. He appeared to listen to group content and participated in discussions without interrupting by discussing his own case. His affect was routinely calm and stable. He denied hallucinations and did not readily discuss delusional ideation. His attention, concentration, and memory appeared to be intact. His speech was relevant and coherent. He remained compliant with the 234 mg injection of paliperidone every four weeks on a voluntary basis. He stated he intended to remain compliant with the medication. On August 18, 2022, a forensic psychologist with the Federal Bureau of Prisons indicated Mr. Proffitt's competency had

been restored as his symptoms of mental illness appeared to be adequately controlled with antipsychotic medication. Mr. Proffitt remains medication compliant and mentally competent to proceed to this day. PSR ¶68.

**Mr. Proffitt's history of working and staying productive despite his cognitive dysfunction**

Living with a major psychiatric disorder is challenging, and many people with schizophrenia have difficulties working or staying productive. Mr. Proffitt did not have difficulty working or staying productive when the intensity of his symptoms was not aggravated by stress. He did not experience delusions all the time. When he wasn't experiencing delusions, he sought out opportunities for education and maintained fulltime employment for an extended period of ten years. PSR ¶74 and ¶79. He also helped raise a child, who is now a successful adult, by guiding the child, supporting the child, and providing a safe and clean home as a primary caretaker though he was not the biological father of the child. *See attached* first and second sentencing letters. This history is important to note, per the sentencing factors of 18 U.S.C. §3553, because it speaks of his character underneath his mental disease. He is capable of positive, outward actions when not laboring under delusions that are the result of a chemical imbalance in his brain.

**The parties' joint recommendation is a just sentence per 18 U.S.C. §3553:**

Mr. Proffitt committed his offense conduct while suffering from a significantly reduced mental capacity that contributed to the commission of his offense. It was difficult for him to control behavior he knew to be wrongful because of his delusions. The U.S. Sentencing Guidelines indicate a downward departure may be warranted in such a situation unless the offense involved aggravating factors. *See* USSG §5K2.13. There is no evidence Mr. Proffitt knew the building he set on fire contained occupied apartments. It did, however. Though no one was physically injured, they could have been. This, combined with prior acts due to delusions, is aggravating, and it is the

core of the parties' joint agreement for the recommended punishment.

Mr. Proffitt has shown significant progress by voluntarily taking an injectable antipsychotic medication that was not available when he previously participated in mental health care in 2001, 2005 and 2010. He has agreed to continue taking medication that improves his symptoms as stipulated by his plea agreement. His marked improvement in cognitive function, his realization that he is ill, and his willingness to work toward rehabilitation as newer medications are developed to control the most troublesome symptoms of his schizophrenia are important to note. However, what the victims of the offense suffered is equally significant to note. This is why a downward variance from the applicable guideline range because of delusional disorder and schizophrenia is not appropriate despite the Presentence Investigation Report identifying such as possible grounds for a variance per federal law. PSR ¶107.

**Conclusion**

Mr. Proffitt's schizophrenia is a lifelong illness that must be managed for his lifetime through medications, therapy, and the coordination of other services for him. Untreated schizophrenia makes the brain more vulnerable to serious and lasting damage from the disorder, so that with each successive episode of symptoms, symptoms can increase in duration and severity and will make it harder to manage the illness. Past a certain point, someone with untreated schizophrenia will not be able to function in normal life. The parties agree their joint recommendation for a total of 191 months of incarceration, followed by three years of supervised release, balances all §3553 factors appropriately as the sentence will afford enough time, but not more than necessary, for Mr. Proffitt to stabilize his mental disease while recognizing the need to protect the public and reflect the seriousness of his offense. For the reasons stated in this memorandum, Mr. Proffitt requests the Court follow the joint recommendation of the parties and sentence him to 191 months of incarceration for his federal offense conduct.

Respectfully submitted,

/s/Jennifer L. Booth
Jennifer L. Booth
Assistant Federal Public Defender
325 Broadway, 2nd Floor
Cape Girardeau, Missouri 63701
Telephone: (573) 339-0242
Fax: (573) 339-0305
E-mail: Jennifer_booth@fd.org

ATTORNEY FOR DEFENDANT

# CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Paul Hahn, Assistant United States Attorney.

/s/Jennifer L. Booth
Jennifer L. Booth